UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


TINA STOLL,

               Petitioner,                                     Hon. Gordon J. Quist

v.                                                    Case No. 1:15-CV-802

ANTHONY STEWART,

               Respondent.

_____/


## REPORT AND RECOMMENDATION

      This matter is before the Court on Stoll's petition for writ of habeas corpus. In accordance with 28 U.S.C. § 636(b) authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of prisoner petitions, the undersigned recommends that Stoll's petition be **denied**.


## BACKGROUND

      As a result of events occurring on January 4, 2008, Petitioner was charged with armed robbery and assault with the intent to commit murder. (Trial Transcript, April 23, 2013 at PageID.283). Several individuals testified at Petitioner's jury trial. The relevant portions of their testimony are summarized below.

**Martha Anderson**

On January 4, 2008, Anderson was working at The Dollar Tree in Petoskey. (Trial Transcript, April 23, 2013 at PageID.460-61). The store opened at 9:00 a.m. that morning at which time only two of the four cash registers contained money. (Trial Transcript, April 23, 2013 at PageID.462-64). The rest of the store's money was in a safe located in an area not accessible to the public. (Trial Transcript, April 23, 2013 at PageID.462-64, 481).

At 9:00 a.m., a woman entered the store and began "wandering" around. (Trial Transcript, April 23, 2013 at PageID.461-66, 479). The woman then grabbed Anderson from behind and placed a knife against her back. (Trial Transcript, April 23, 2013 at PageID.466-67). The woman guided Anderson to the front of the store and instructed her to lock the doors. (Trial Transcript, April 23, 2013 at PageID.467). The woman then guided Anderson past the cash registers directly to the safe. (Trial Transcript, April 23, 2013 at PageID.467). Anderson was then instructed to open the safe which she did. (Trial Transcript, April 23, 2013 at PageID.467). Anderson removed the money from the safe and placed it in a white bag with a Dollar Tree logo. (Trial Transcript, April 23, 2013 at PageID.467-68).

The woman then directed Anderson to remove the money from the two cash registers containing cash. (Trial Transcript, April 23, 2013 at PageID.468-70, 479-80). The stolen money included stacks of one-dollar bills held together with paper clips and various denominations of coins in cellophane wrapped rolls. (Trial Transcript, April 23, 2013 at PageID.469-70). The woman expressed no interest in the two other cash registers which did not contain money. (Trial Transcript, April 23, 2013 at PageID.479-80).

The woman then led Anderson to the rear of the store and attacked her with a knife,

stabbing her in the chest and cutting her throat. (Trial Transcript, April 23, 2013 at PageID.470-75). The entire incident lasted only a few minutes. (Trial Transcript, April 23, 2013 at PageID.477-78). Anderson was unable to identify her assailant, but a coat later recovered from Petitioner's residence was the same length, style, and color as that worn by Anderson's assailant. (Trial Transcript, April 23, 2013 at PageID.482-87).

**Dr. Khalil Attie**

Dr. Attie treated Martha Anderson after she was transported to an emergency room. (Trial Transcript, April 23, 2013 at PageID.560-61). Anderson suffered stab wounds to her neck and blunt force trauma to her chest. (Trial Transcript, April 23, 2013 at PageID.560-67).

**Brandy Lapeer**

As of January 4, 2008, Lapeer was the manager of the Dollar Tree in Petoskey. (Trial Transcript, April 23, 2013 at PageID.569-70). Petitioner worked at the Dollar Tree in 2006 as an Assistant Manager. (Trial Transcript, April 23, 2013 at PageID.570-72). In her capacity as an Assistant Manager, Petitioner would have been familiar with the store's procedures including those regarding cash management. (Trial Transcript, April 23, 2013 at PageID.572-75).

On an occasion during Christmas season, shortly prior to the January 4, 2008 armed robbery and assault of Martha Anderson, Lapeer arrived at the Dollar Tree very early, between 6:00-7:00 a.m. (Trial Transcript, April 23, 2013 at PageID.576). On this particular morning, Lapeer was outside behind the store "throwing empty boxes in the dumpster" when she observed Petitioner "coming up the ramp to the loading dock." (Trial Transcript, April 23, 2013 at PageID.576). Lapeer

re-entered the store and "waited to see if [Petitioner] came up and knocked on the back door." (Trial Transcript, April 23, 2013 at PageID.576). When Petitioner failed to knock on the door, Lapeer opened the back door and observed Petitioner standing "right beside the back door." (Trial Transcript, April 23, 2013 at PageID.576-77). When Lapeer asked Petitioner what she was doing, Petitioner responded that she "was looking for boxes" because she was moving. (Trial Transcript, April 23, 2013 at PageID.577). Lapeer told Petitioner she could take boxes from the dumpster. (Trial Transcript, April 23, 2013 at PageID.577). Lapeer then reentered the store, but watched to see what Petitioner would do. (Trial Transcript, April 23, 2013 at PageID.577). Petitioner "never approached the dumpster to get boxes," but instead "just left." (Trial Transcript, April 23, 2013 at PageID.577).

**John Goble**

As of January 4, 2008, Goble was employed as an Emmet County Juvenile Probation Officer. (Trial Transcript, April 24, 2013 at PageID.613). As of this date, Petitioner's son was one of the offenders Goble was supervising. (Trial Transcript, April 24, 2013 at PageID.613). Goble had an appointment to meet with Petitioner that morning at 10:00 a.m., but Petitioner arrived early at "around 9:30 a.m." (Trial Transcript, April 24, 2013 at PageID.613-14). Petitioner met with Goble to inform him that she was moving to Tennessee within the week. (Trial Transcript, April 24, 2013 at PageID.614-15). Petitioner was experiencing financial difficulty, but still owed money to the court related to her son's conviction. (Trial Transcript, April 24, 2013 at PageID.619). During this brief meeting, Petitioner "seemed a little bit out of sort" and was "mildly in a rush" to get through her meeting with Goble. (Trial Transcript, April 24, 2013 at PageID.615-616).

**Teresa Neizgoda**

As of January 4, 2008, Neizgoda was employed as the Financial Officer for the Emmet County Probate and Family Court. (Trial Transcript, April 24, 2013 at PageID.622). As of this date, Petitioner owed the court $258.75. (Trial Transcript, April 24, 2013 at PageID.622). Sometime that day, Petitioner informed Neizgoda that "she was gonna be coming into some money" and would return to pay the entire amount she owed. (Trial Transcript, April 24, 2013 at PageID.622).

**Renee Bayha**

At approximately 9:00 a.m. on the morning of January 4, 2008, Bayha observed a woman "walking very fast with her head down" toward the Dollar Tree. (Trial Transcript, April 24, 2013 at PageID.625-26). Bayha did not observe if the woman entered the Dollar Tree, however. (Trial Transcript, April 24, 2013 at PageID.629).

**Stephanie Fosmore**

As of January 4, 2008, Fosmore worked at a clothing store located adjacent to the Dollar Tree. (Trial Transcript, April 24, 2013 at PageID.638-39). Fosmore arrived at work that morning at 8:00 a.m. (Trial Transcript, April 24, 2013 at PageID.638-39). Shortly before 9:00 a.m., Fosmore observed a woman in a black car who "looked like she was wrapping her head." (Trial Transcript, April 24, 2013 at PageID.639). Fosmore thought nothing of this and returned to work. (Trial Transcript, April 24, 2013 at PageID.639). A few minutes later, Fosmore exited her store to go to the bank at which point she observed that the woman was no longer sitting in her car. (Trial

Transcript, April 24, 2013 at PageID.639-40). Fosmore returned to her store 10-15 minutes later by which time the black car was gone. (Trial Transcript, April 24, 2013 at PageID.640-43).

**Stephanie Hull**

Hull was the accounts manager at Simple Auto and Simple Credit, a "buy here, pay here auto dealership." (Trial Transcript, April 24, 2013 at PageID.670). Petitioner's mother purchased a vehicle from Simple Auto. (Trial Transcript, April 24, 2013 at PageID.671). The vehicles that Simple Auto sells are installed with a device that permits Simple Auto to immobilize the vehicle in the event that payments are not timely made. (Trial Transcript, April 24, 2013 at PageID.676-77). On January 4, 2008, Petitioner made a cash payment to Simple Auto in the amount of $157.00. (Trial Transcript, April 24, 2013 at PageID.672-73). As of this date, the payment in question was more than ten days late. (Trial Transcript, April 24, 2013 at PageID.674-76).

**Tracy Turcott**

As of January 4, 2008, Petitioner lived across the street from Turcott's aunt. (Trial Transcript, April 24, 2013 at PageID.684). Turcott agreed to take custody of Petitioner's son so that he could remain in Petoskey to complete school after Petitioner moved to Tennessee. (Trial Transcript, April 24, 2013 at PageID.685-87). Turcott met with Petitioner on the afternoon of Janaury 4, 2008, to execute documents to facilitate this agreement. (Trial Transcript, April 24, 2013 at PageID.686-88). On this date, Petitioner was driving a black car. (Trial Transcript, April 24, 2013 at PageID.686-90).

The following evening, Turcott went to her aunt's residence. (Trial Transcript, April

24, 2013 at PageID.690). Several people were present, including Petitioner. (Trial Transcript, April 24, 2013 at PageID.691). The group began talking about the Dollar Tree robbery that occurred the previous day. (Trial Transcript, April 24, 2013 at PageID.691-92). By this time, a search warrant had been executed at Petitioner's residence. (Trial Transcript, April 24, 2013 at PageID.691-95). Petitioner was discussing the matter and "had an excuse for every piece of evidence" the police recovered from her house. (Trial Transcript, April 24, 2013 at PageID.691-95). Petitioner also asserted that if her hair was recovered from the crime scene it was only because she worked there previously. (Trial Transcript, April 24, 2013 at PageID.692).

**Anthony Rice**

As of January 4, 2008, Rice was employed as a Lieutenant with the Petoskey Department of Public Safety. (Trial Transcript, April 24, 2013 at PageID.704). That morning, Rice was dispatched to the Dollar Tree to assist in processing the crime scene. (Trial Transcript, April 24, 2013 at PageID.704, 712). As part of his efforts, Rice discovered the scarf which the attacker had been wearing. (Trial Transcript, April 24, 2013 at PageID.705).

**Frances D'Angela**

D'Angela worked for the Michigan State Police Biology Unit. (Trial Transcript, April 24, 2013 at PageID.748). D'Angela analyzed the scarf recovered from the crime scene in February 2008. (Trial Transcript, April 24, 2013 at PageID.771-72). D'Angela recovered two hairs from the scarf, but because the hairs had "no tissue at the root end," they were not suitable to perform traditional DNA testing. (Trial Transcript, April 24, 2013 at PageID.749-50). The hairs

were suitable, however, for mitochondrial DNA testing, but because the Michigan State Police lab does not perform mitochondrial DNA testing, the hairs were returned to the Petoskey Department of Public Safety.  (Trial Transcript, April 24, 2013 at PageID.749-50).


**Barbara Leal**

Leal was employed as a DNA analyst for Orchid Cellmark, a "private forensic laboratory that specializes in forensic DNA testing."  (Trial Transcript, April 24, 2013 at PageID.826).  Leal performed mitochondrial DNA testing on the hair recovered from the scarf recovered from the crime scene.  (Trial Transcript, April 24, 2013 at PageID.826-33).  Traditional DNA testing is "more specific" and permits the examiner to "uniquely identify" an individual. (Trial Transcript, April 24, 2013 at PageID.831).  On the other hand, mitochondrial DNA testing permits an examiner to merely exclude or not exclude an individual as compared to a known sample. (Trial Transcript, April 24, 2013 at PageID.833).  The results of Leal's testing did not exclude Petitioner as the donor of the hair located in the scarf.  (Trial Transcript, April 24, 2013 at PageID.834).


**Ben Carlson**

As of January 4, 2008, Carlson was employed as a Public Safety Officer for the City of Petoskey.  (Trial Transcript, April 24, 2013 at PageID.890-91).  At 9:13 a.m. that morning, Carlson was dispatched to Dollar Tree to investigate a robbery and assault.  (Trial Transcript, April 24, 2013 at PageID.891-92).  Upon arriving at the crime scene. Carlson observed a scarf on the floor.  (Trial Transcript, April 24, 2013 at PageID.892).

Early that afternoon, Carlson drove to Petitioner's residence. (Trial Transcript, April 24, 2013 at PageID.894-95). Upon arriving, Carlson observed a vehicle matching the description of the vehicle observed at the crime scene. (Trial Transcript, April 24, 2013 at PageID.894-95). Carlson observed inside the vehicle a white grocery bag with a Dollar Tree symbol. (Trial Transcript, April 24, 2013 at PageID.895). Carlson spoke with Petitioner's daughter who informed Carlson that Petitioner was not at home. (Trial Transcript, April 24, 2013 at PageID.895-96).

**Frederick Haalck**

As of January 4, 2008, Haalck was employed as a Public Safety Officer for the City of Petoskey. (Trial Transcript, April 24, 2013 at PageID.922). That morning Haalck was dispatched to Dollar Tree to investigate a robbery and assault. (Trial Transcript, April 24, 2013 at PageID.922-23). Paramedics arrived on the scene "moments before" Haalck arrived on the scene. (Trial Transcript, April 24, 2013 at PageID.923-24). Haalck accompanied Martha Anderson to the hospital and was able to eventually speak with her and obtain a description of her assailant. (Trial Transcript, April 24, 2013 at PageID.923-25). Later that day, Anderson met with an artist who created a sketch based upon Anderson's description of her assailant. (Trial Transcript, April 24, 2013 at PageID.925).

The following day, the police obtained a warrant to search Petitioner's residence. (Trial Transcript, April 24, 2013 at PageID.927). This search revealed stacks of 20 one dollar bills secured with paperclips as well as "rolled coinage in cardboard style containers." (Trial Transcript, April 24, 2013 at PageID.932-33). Haalck also recovered several knives from throughout the residence. (Trial Transcript, April 24, 2013 at PageID.935-39). A second search conducted several

days later revealed clear coin wrappers similar to the ones used to secure the coins stolen from the Dollar Tree. (Trial Transcript, April 24, 2013 at PageID.940-43).

**Todd Troxel**

As of January 5, 2008, Troxel was employed as a City of Petoskey Police Officer. (Trial Transcript, April 25, 2013 at PageID.1031-32). On this date, Troxel seized a black Pontiac Grand Prix from Petitioner's residence. (Trial Transcript, April 25, 2013 at PageID.1032). Troxel examined the interior of the vehicle for blood evidence or blood spatter, but his efforts were inconclusive because the vehicle "was very unkempt, very dirty." (Trial Transcript, April 25, 2013 at PageID.1032-34).

**Randall Weston**

As of January 4, 2008, Weston was employed as a Lieutenant with the Petoskey Department of Public Safety. (Trial Transcript, April 25, 2013 at PageID.1044). At 9:13 a.m., Weston was dispatched to the Dollar Tree to investigate an armed robbery. (Trial Transcript, April 25, 2013 at PageID.1044). Weston's initial investigation led him to believe that the perpetrator "had knowledge of the store." (Trial Transcript, April 25, 2013 at PageID.1044-51). Weston later instructed Officer Carlson to go to Petitioner's residence to speak with Petitioner. (Trial Transcript, April 25, 2013 at PageID.1050-51). When Weston viewed a photograph of Petitioner next to the artist sketch of Martha Anderson's assailant, Weston observed that "there were striking resemblances" between the two. (Trial Transcript, April 25, 2013 at PageID.1053-54). Weston subsequently obtained a warrant to obtain blood and DNA samples from Petitioner. (Trial

Transcript, April 25, 2013 at PageID.1057-59).

The scarf that was recovered from the crime scene was initially sent to the Michigan State Police Crime Lab. (Trial Transcript, April 25, 2013 at PageID.1060). The lab later returned the two hairs recovered from the scarf because such were not amenable to traditional DNA analysis. (Trial Transcript, April 25, 2013 at PageID.1060-61). The hairs were subsequently sent to the DNA Testing Center to perform mitcochondrial DNA testing. (Trial Transcript, April 25, 2013 at PageID.1061). The DNA Testing Center outsourced this testing to GenTech, however, a fact which authorities only later learned. (Trial Transcript, April 25, 2013 at PageID.1061). However, at the time GenTech did not possess the necessary certification to conduct forensic examination in a criminal case. (Trial Transcript, April 25, 2013 at PageID.1062). In April 2012, once it became evident that GenTech would not be able to obtain the necessary certification, the remaining hair was sent to Orchid Cellmark for testing. (Trial Transcript, April 25, 2013 at PageID.1061-62).

Shortly after the robbery in question, Weston interviewed Petitioner. (Trial Transcript, April 25, 2013 at PageID.1062-63). Petitioner denied involvement in the robbery and asserted that she was with her mother on the morning in question. (Trial Transcript, April 25, 2013 at PageID.1063-66). Petitioner asserted that she awoke at 9:00 a.m. and arrived at the courthouse between 9:20 a.m. and 9:30 a.m. to meet with John Goble. (Trial Transcript, April 25, 2013 at PageID.1063-64). Petitioner asserted that she met with Goble and then spoke with somebody concerning her son's outstanding court fees before returning home. (Trial Transcript, April 25, 2013 at PageID.1065-66). Petitioner indicated that her mother accompanied her that morning. (Trial Transcript, April 25, 2013 at PageID.1066). Petitioner made no mention of making a car payment that day. (Trial Transcript, April 25, 2013 at PageID.1069).

As part of their investigation, officials interviewed Candy Willobee who also volunteered a DNA sample. (Trial Transcript, April 25, 2013 at PageID.1082). The investigation uncovered no evidence implicating Willobee and DNA testing excluded her as the donor of the hairs recovered from the scarf worn by the assailant. (Trial Transcript, April 25, 2013 at PageID.1082-83).

**David Schultz**

As of August 15, 2012, Schultz was employed as a Police Officer for the City of Petoskey. (Trial Transcript, April 25, 2013 at PageID.1191). On this date, Schultz interviewed Petitioner following her arrest. (Trial Transcript, April 25, 2013 at PageID.1191). Schultz confronted Petitioner with the evidence gathered during the investigation, including the DNA evidence. (Trial Transcript, April 25, 2013 at PageID.1191-92). Petitioner did not deny that the scarf recovered from the crime scene was hers, but contended that "someone must have taken a scarf from her home." (Trial Transcript, April 25, 2013 at PageID.1192).

When asked to describe her actions on January 4, 2008, Petitioner stated that she awoke late and that her car would not start because the payment was overdue. (Trial Transcript, April 25, 2013 at PageID.1193-94). Petitioner stated that she first contacted Simple Auto "to get a code to start the car," after which she "immediately went to Simple Auto to make the payment to keep the car active and running." (Trial Transcript, April 25, 2013 at PageID.1194). Petitioner indicated that she then drove to the courthouse "to make arrangements to leave the State of Michigan." (Trial Transcript, April 25, 2013 at PageID.1194). Petitioner made no mention that her mother accompanied her that morning. (Trial Transcript, April 25, 2013 at PageID.1194). When asked about the evidence recovered from her residence, Petitioner stated that she "did not know how

the coin[s] or coin wrappers got into her home." (Trial Transcript, April 25, 2013 at PageID.1195).

Petitioner was interviewed a second time several months later. (Trial Transcript, April 25, 2013 at PageID.1195-96). On this occasion, Petitioner offered a different version of her activities on the morning of January 4, 2008. (Trial Transcript, April 25, 2013 at PageID.1197). Specifically, Petitioner stated that her and mother went to the courthouse before going to Simple Auto. (Trial Transcript, April 25, 2013 at PageID.1197). Petitioner made no mention of her car not being able to start due to an overdue payment. (Trial Transcript, April 25, 2013 at PageID.1197). Regarding the coins that were recovered from her residence, Petitioner stated that she and her children had counted and separated the coins. (Trial Transcript, April 25, 2013 at PageID.1197).

**Candy Willobee**

On April 28, 2010, Willobee used a knife to commit armed robbery in Gaylord, Michigan. (Trial Transcript, April 25, 2013 at PageID.1215-16). Willobee denied committing the January 4, 2008 robbery of the Dollar Tree. (Trial Transcript, April 25, 2013 at PageID.1222).

**Tina Stoll**

Petitioner denied committing the armed robbery of the Dollar Tree on January 4, 2008. (Trial Transcript, April 25, 2013 at PageID.1232). Petitioner likewise denied assaulting Martha Anderson on January 4, 2008. (Trial Transcript, April 25, 2013 at PageID.1232). Petitioner asserted that when she spoke with the police in 2008, she informed them that she had been with her mother on the morning in question. (Trial Transcript, April 25, 2013 at PageID.1233). Petitioner's mother died on February 3, 2011. (Trial Transcript, April 25, 2013 at PageID.1233).

Petitioner conceded that she previously worked at Dollar Tree and was familiar with the store's procedures for handling money. (Trial Transcript, April 25, 2013 at PageID.1238-39). Petitioner acknowledged encountering Brandy Lapeer early one morning behind the Dollar Tree store one or two weeks prior to the robbery. (Trial Transcript, April 25, 2013 at PageID.1246-47). With respect to the scarf recovered from the crime scene, Petitioner initially denied owning it, but then asserted that somebody must have stolen it from her house. (Trial Transcript, April 25, 2013 at PageID.1251).

Approximately one week before the robbery, Petitioner's husband moved out and took "like $20,000" with him. (Trial Transcript, April 25, 2013 at PageID.1246). After her husband moved out, Petitioner's sole source of income was her daughter's disability payments in the amount of $674 monthly. (Trial Transcript, April 25, 2013 at PageID.1243-44).

Following the presentation of evidence, the jury found Petitioner guilty of armed robbery and assault with the intent to commit murder. (Trial Transcript, April 26, 2013 at PageID.1381). The court sentenced Petitioner, as an habitual offender, to serve 20-40 years in prison. (Sentencing Transcript, June 3, 2013 at PageID.1399-1400). Petitioner subsequently appealed her conviction in the Michigan Court of Appeals asserting the following claims:

> I. The prosecution violated Ms. Stoll's due process rights by waiting four years to charge her. Dismissal is required because she was prejudiced by the death of her only alibi witness and because the delay was for tactical reasons.

The Michigan Court of Appeals affirmed Petitioner's conviction. *People v. Stoll*, 2014 WL 5409004 (Mich. Ct. App., Oct. 23, 2014). Asserting the same claim, Petitioner later moved in the Michigan Supreme Court for leave to appeal. The court denied leave to appeal on the

ground that "we are not persuaded that the questions presented should be reviewed by this Court."

*People v. Stoll*, 861 N.W.2d 283 (Mich. 2015). On August 5, 2015, Petitioner initiated the present

action asserting the claim identified above.

## STANDARD OF REVIEW

Stoll's petition is subject to the provisions of the Antiterrorism and Effective Death

Penalty Act (AEDPA), as it amended 28 U.S.C. § 2254. The AEDPA amended the substantive

standards for granting habeas relief under the following provisions:

> (d)   An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> (1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or
>
> (2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The AEDPA has "modified" the role of the federal courts in habeas proceedings to

"prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the

extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002).

Pursuant to § 2254(d)(1), a decision is "contrary to" clearly established federal law

when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a

question of law" or "if the state court confronts facts that are materially indistinguishable from a

relevant Supreme Court precedent and arrives at an opposite result." *Ayers v. Hudson*, 623 F.3d 301, 307 (6th Cir. 2010) (quoting *Williams v. Taylor*, 529 U.S. 362, 405 (2000)).

Prior to *Williams*, the Sixth Circuit interpreted the "unreasonable application" clause of § 2254(d)(1) as precluding habeas relief unless the state court's decision was "so clearly incorrect that it would not be debatable among reasonable jurists." *Gordon v. Kelly*, 2000 WL 145144 at *4 (6th Cir., February 1, 2000); *see also*, *Blanton v. Elo*, 186 F.3d 712, 714-15 (6th Cir. 1999). The *Williams* Court rejected this standard, indicating that it improperly transformed the "unreasonable application" examination into a subjective inquiry turning on whether "at least one of the Nation's jurists has applied the relevant federal law in the same manner" as did the state court. *Williams*, 529 U.S. at 409.

In articulating the proper standard, the Court held that a writ may not issue simply because the reviewing court "concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams,* 529 U.S. at 411. Rather, the Court must also find the state court's application thereof to be *objectively* unreasonable. *Bell*, 535 U.S. at 694; *Williams*, 529 U.S. at 409-12. Accordingly, a state court unreasonably applies clearly established federal law if it "identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case" or if it "either unreasonably extends or unreasonably refuses to extend a legal principle from the Supreme Court precedent to a new context." *Ayers*, 623 F.3d at 307. Furthermore, review under § 2254(d)(1) "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

Pursuant to 28 U.S.C. § 2254(d)(2), when reviewing whether the decision of the state

court was based on an unreasonable determination of the facts in light of the evidence presented, the "factual determination by [the] state courts are presumed correct absent clear and convincing evidence to the contrary." *Ayers*, 623 F.3d at 308. Accordingly, a decision "adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." While this standard is "demanding" it is "not insatiable." *Id.*

For a writ to issue pursuant to § 2254(d)(1), the Court must find a violation of clearly established federal law "as set forth by the Supreme Court at the time the state court rendered its decision." *Stewart v. Irwin*, 503 F.3d 488, 493 (6th Cir. 2007). This definition of "clearly established federal law" includes "only the holdings of the Supreme Court, rather than its dicta." *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). Nevertheless, "the decisions of lower federal courts may be instructive in assessing the reasonableness of a state court's resolution of an issue." *Stewart*, 503 F.3d at 493.

As previously noted, § 2254(d) provides that habeas relief "shall not be granted with respect to any claim that was adjudicated on the merits" unless the petitioner can satisfy the requirements of either § 2254(d)(1) or § 2254(d)(2). This provision, however, "does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'" *Harrington v. Richter*, 131 S.Ct. 770, 785 (2011). Instead, when a federal claim has been presented to a state court and the state court has denied relief, "it may be presumed that the state court adjudicated the claim on the merits." *Id.* at 784-85. Where such is the case, the Court must apply the deferential standard of review articulated above, rather than some other less deferential standard.

The presumption that the state court "adjudicated [a] claim on the merits" may be overcome only "when there is reason to think some other explanation for the state court's decision is more likely." *Id.* If this presumption is overcome, however, the Court reviews the matter de novo. *See Wiggins v. Smith*, 539 U.S. 510, 533-35 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question); *see also, Maples v. Stegall*, 340 F.3d 433, 437 (6th Cir. 2003) (recognizing that *Wiggins* established *de novo* standard of review for any claim that was not addressed by the state courts).

## ANALYSIS

The robbery of the Dollar Tree and assault of Martha Anderson occurred on January 4, 2008. Petitioner was not charged with committing this offense until June 13, 2012. (Motion Transcript, February 14, 2013 at PageID.250). While the precise date Petitioner was arrested is unclear, it was no later than August 15, 2012, the date on which Petitioner was interviewed by Officer David Schultz. (Trial Transcript, April 25, 2013 at PageID.1191). Petitioner argues that she is entitled to relief on the ground that the delay between the commission of the offense and the initiation of criminal proceedings violated her right to due process.

In *United States v. Lovasco*, 431 U.S. 783 (1977), the Court considered "the circumstances in which the Constitution requires that an indictment be dismissed because of delay between the commission of an offense and the initiation of prosecution." *Id.* at 784. Lovasco was indicted on March 6, 1975, for crimes allegedly committed in July and August 1973. *Ibid.* During this interim, two witnesses material to Lovasco's defense died. *Id.* at 785-86. Arguing that his ability to defend himself was prejudiced by the loss of these two witnesses, Lovasco argued that the

criminal charges should be dismissed on the ground that the pre-indictment delay violated his right

to due process of law.  *Id.* at 784-86.  Finding the delay to be "unnecessary and unreasonable," the

district court dismissed the indictment.  *Id.* at 786-87.  On appeal, the Eighth Circuit concluded that

"the sole reason for the delay here was 'a hope on the part of the Government that others might be

discovered who may have participated in the theft."  *Id.* at 790.  Finding that this rationale did not

justify the delay in question, the Eighth Circuit affirmed the district court's decision.  *Id.* at 787-88.

The Supreme Court agreed to review the matter and reversed the Eighth Circuit's decision.

       The Court first observed that the concept of due process "does not permit courts to

abort criminal prosecutions simply because they disagree with a prosecutor's judgment as to when

to seek an indictment."  *Id.* at 790.  Likewise, "fundamental conceptions of justice" do not compel

prosecutors to "file charges as soon as probable cause exists but before they are satisfied they will

be able to establish the suspect's guilt beyond a reasonable doubt."  *Id.* at 791.  As the Court

recognized, "no one's interests would be well served by compelling prosecutors to initiate

prosecutions as soon as they are legally entitled to do so."  *Id.* at 792.  Such would increase the

likelihood of unwarranted charges being filed, make it more difficult for law enforcement to

properly investigate criminal matters, and unduly tax the judicial system's scarce resources.  *Id.* at

791-92.

       The Court, therefore, held that "to prosecute a defendant following investigative

delay does not deprive him of due process, even if his defense might have been somewhat prejudiced

by the lapse of time."  *Id.* at 796.  Accordingly, dismissal of criminal charges on the basis of a delay

between the commission of the offense and initiation of criminal proceedings is appropriate only "if

the defendant can prove that the Government's delay in bringing the indictment was a deliberate

device to gain an advantage over him and that it caused him actual prejudice in presenting his defense." *United States v. Gouveia*, 467 U.S. 180, 192 (1984); *see also*, *Parker v Burt*, 595 Fed. Appx. 595, 601 (6th Cir., Jan. 5, 2015) (preindictment delay violates due process "only when the defendant shows (1) substantial prejudice to his right to a fair trial *and* (2) that the delay was an intentional device by the government to gain a tactical advantage").

Petitioner argues that her ability to defend herself in this matter was prejudiced by the fact that her mother, her "only alibi witness," died sixteen months before charges were initiated. However, even if prejudice is assumed, Petitioner cannot establish that the prosecution intentionally delayed initiating criminal proceedings for the purpose of gaining a tactical advantage.

As discussed above, the two hairs recovered from the crime scene were not amenable to traditional DNA testing, but instead had to be tested using mitochondrial DNA methods. The Michigan State Police lab was unable to perform this type of testing, however, so the police sent the hair samples to a private lab. Unbeknownst to the police, however, the lab in question subcontracted its mitochondrial DNA testing to a facility which was not properly accredited. The police waited in the hopes that the lab's accreditation issues would be resolved, but once it became clear that such was not going to occur the second, and final, hair sample was sent to a different lab for testing.

While the length of the delay in this matter is not insignificant, such must be understood in context. While there existed a great deal of circumstantial evidence supporting Petitioner's guilt, such was counterbalanced by the fact that Martha Anderson was unable to positively identify her assailant and, furthermore, that there was no other direct evidence against Petitioner. Thus, the desire by the prosecution to obtain DNA testing, by an accredited lab, of material recovered from the crime scene was not unreasonable. It must also be remembered that the

20

police only recovered two hairs from the crime scene. Once a problem arose with the lab that conducted the initial DNA testing, the authorities, not unreasonably, took care to secure the integrity of the second hair recovered from the crime scene. As the prosecutor described the matter:

> [T]he problem we had was this Texas lab couldn't become accredited. So, we tried to wait and see if they would become accredited and Officer Weston contacted them many times in the interim between 2008 and 2012. The problem was they could never become accredited.
>
> The other issue we had was we were very reluctant to go to another lab because we only had so much hair evidence and we were worried that there was only enough left for one more test and if anything went wrong on that whole situation we were all done.
>
> Ultimately, it became obvious in 2012, that the Texas lab could not become accredited. So, that's when we decided we had to go to the other lab, Orchard Cellmark, to have them test and take the risk that all this evidence is gonna be lost if anything happens to it, and that's when we get the second mitochondrial sequential testing situation once again pointing back to our suspect, Tina Stoll.

(Hearing Transcript, February 14, 2013 at PageID.254-55).

While the prosecution's actions can, in hindsight, arguably be second-guessed, the question is not whether law enforcement could have conducted its investigation with greater efficiency or speed, but instead whether the prosecution intentionally delayed initiating criminal proceedings against Petitioner for the purpose of gaining a tactical advantage. Petitioner has failed to present, at any stage of these proceedings, any evidence to support her argument. The Michigan Court of Appeals rejected Petitioner's argument thusly:

> Moreover, even were we to conclude that defendant suffered actual and substantial prejudice, there is no evidence that the prosecution delayed bringing charges in order to gain a tactical advantage. Instead, the delay was due to the struggle in obtaining mitochondrial-DNA test results from an accredited laboratory. Defendant argues that the prosecution could have proceeded with the

results from the first laboratory, even though it was unaccredited, because the laboratory's accreditation status would have "merely provided fodder for cross-examination." While perhaps true, the prosecution's decision to seek evidence from an accredited laboratory as part of the investigation did not violate due process. In *United States v. Lovasco,* 431 U.S. 783, 795–796, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977), the United States Supreme Court observed:

> In our view, investigative delay is fundamentally unlike delay undertaken by the Government solely "to gain tactical advantage over the accused," precisely because investigative delay is not so one-sided. Rather than deviating from elementary standards of "fair play and decency," a prosecutor abides by them if he refuses to seek indictments until he is completely satisfied that he should prosecute and will be able promptly to establish guilt beyond a reasonable doubt. Penalizing prosecutors who defer action for these reasons would subordinate the goal of "orderly expedition" to that of "mere speed." This the Due Process Clause does not require.

Given the victim's inability to identify defendant as the perpetrator, the suggestion of another possible suspect, who was excluded by the mitochondrial-DNA testing, and the first laboratory's problematic lack of accreditation, the prosecutor abided by elementary standards of fair play and decency in delaying defendant's arrest. The trial court did not err in its ruling. Defendant was not deprived of her right to due process.

*Stoll*, 2014 WL 5409004 at *3.

In light of the above authority and facts, the Court concludes that this decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue upon which habeas relief may be granted.

## <u>CONCLUSION</u>

For the reasons articulated herein, the undersigned concludes that Petitioner is not being confined in violation of the laws, Constitution, or treaties of the United States. Accordingly, the undersigned recommends that Stoll's petition for writ of habeas corpus be **denied**. The undersigned further recommends that a certificate of appealability be denied. *See Slack v. McDaniel*, 529 U.S. 473 (2000).

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within 14 days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,


Date:  June 13, 2017                                             /s/ Ellen S. Carmody
                                                                              ELLEN S. CARMODY
                                                                              United States Magistrate Judge